OPINION
This is an appeal from the judgment entry of divorce issued by the Lake County Court of Common Pleas, Domestic Relations Division, in which the trial court granted appellant/cross-appellee, Raymond D. McLeod, and appellee/cross-appellant, Ruth H. McLeod, a divorce.[1]
Appellant and appellee were married on June 27, 1974. No children have been born as issue of the marriage. This was the second marriage for both parties.
Appellant is the sole owner of Douglass McLeod, Inc., ("Douglass 
McLeod"), a family business located in Grand River, Ohio, and involved in the building of boats. However, during the marriage, the boat building operation ceased, and the corporation operated as a small marina. Also, during the marriage, appellee performed secretarial duties for the corporation on a sporadic basis.
After twenty-three years of marriage, appellee filed a complaint for divorce on November 7, 1997. This matter came on for a hearing before a magistrate on January 15, 1999, May 27, 1999, May 28, 1999, and August 26, 1999. The magistrate issued her decision for the grant of divorce on December 15, 1999. Because the parties entered into numerous stipulations, the remaining issues in the case were the value and separate/marital nature of the ownership of Douglass McLeod, which included certain real estate.
In relevant part to this appeal, the magistrate found as follows: (1) 47 shares of Douglass McLeod stock that were gifted to appellant during the marriage were characterized as marital property; (2) prior to the marriage, appellant purchased 170 shares of Douglass McLeod stock for approximately $75,000, or $441.18 per share. This purchase was financed with a mortgage issued from Douglass McLeod prior to the marriage, but was subsequently paid off during the marriage with marital funds; thus, the stocks were deemed marital property; (3) in 1988, property owned by Douglass McLeod, to wit: 210 River Street, was sold with a sale proceeds totaling over $106,000. In 1990, a portion of the sale proceeds, approximately $36,000, was used to pay off the building located at 203 River Street ("Kishman property"). The Kishman property was purchased during the marriage in 1983 and titled jointly to the parties. The magistrate determined the proceeds from the sale of 210 River Street and the interest the Kishman property were marital in nature; (4) the magistrate ordered the sale of the corporation, including the Kishman and 209 River Street properties; the proceeds from the sale of the Kishman property were to be divided equally between the parties as marital property; from the sale of the corporation and 209 River Street, appellant was to receive the first $56,250.45, which represented his separate interest in Douglass McLeod of 127.5 shares of stock at $441.18 per share, with the remaining balance from the sale proceeds then to be divided equally; (5) there was "no evidence submitted to support any determination as to whether any increase in [appellant's] separate property would be separate due to a passive increase in value[;]" and (6) no spousal support was awarded, and each party was responsible for payment of his/her attorney fees.
Upon discovering that a malfunction had occurred during the recording of a portion of the May 28, 1999 hearing before the magistrate, the trial court issued a judgment entry on March 16, 2000, ordering the parties' attorneys to submit their respective affidavits as to the facts and evidence they believed was presented during the hearing. In addition, the trial court ordered that upon receipt of the affidavits, the magistrate was to provide a written summary of the facts and evidence presented to her at the May 28, 1999 hearing.
After being granted numerous extensions, appellant and appellee filed objections to the magistrate's decision with the trial court on May 9, 2000. Upon reviewing the three-volume transcript, the affidavits of parties' counsel, and the magistrate's summary, the trial court made the following determinations relevant to this appeal: (1) the court rejected the magistrate's recommendation to sell the properties. Instead, the court found appellant's appraisal expert, Mr. George F. Weisenbach ("Mr. Weisenbach") more credible than appellee's expert, Mr. Wesley E. Baker ("Mr. Baker"). In adopting Mr. Weisenbach's opinion, the trial court assigned a value of $280,000 to the 209 River Street property and $85,000 to the Kishman property; (2) the court rejected the magistrate's recommendation that the 47 shares of Douglass McLeod stock were marital. Since appellant testified he received this stock as a gift, which was uncontroverted by appellee, the stock was deemed to be his separate property; (3) 170 shares of stock were marital as the debt to pay for these stocks was paid during the marriage with marital funds; (4) the trial court equally divided the value of the Kishman property, and each party received $42,500; (5) the appreciation in 209 River Street property during the marriage totaled $125,000, and this was to be divided equally between the parties as the appreciation was not passive; and (6) the court ordered appellant to pay appellee $105,000 ($42,500 + $62,500), which represented her marital interest in the Kishman and 209 River Street properties, and ordered appellant to transfer to appellee 120.5 shares of stock.
On October 26, 2000, the trial court issued its judgment entry of divorce. It is from this judgment appellant appeals, advancing five assignments of error for our consideration:[2]
 "[1.] The trial court's determination that 170 shares of Douglass McLeod, Inc. stock owned by the appellant prior to the marriage were entirely marital was against the manifest weight of the evidence.
 "[2.] The trial court erred in finding that the entire value of the property at 203 River Street was marital property.
 "[3.] The trial court's classifaication [sic] of all of the appreciation and value of Douglass McLeod, Inc. as marital property was against the manifest weight of the evidence.
 "[4.] The trial court erred in awarding the appellee one-half of the stock in Douglass McLeod, Inc., and also awarding her $75,000.00 representing one-half of the appreciation in value of said stock.
 "[5.] The trial court abused its discretion in awarding the wife shares of stock in Douglass McLeod, Inc."[3]
In the first assignment of error, appellant submits that the trial court's determination that the 170 shares of stock were entirely marital property is against the manifest weight of the evidence. According to appellant, the evidence shows that he acquired these shares prior to the marriage, and the purchase was financed through a note and mortgage signed by Douglass McLeod; thus, appellant claims that appellee was not obligated on the mortgage, nor did the mortgage encumber marital property. From this, appellant concludes that the 170 shares should be deemed his separate property.
"The trial court's characterization of property as either marital or separate necessarily involves a factual inquiry under the manifest weight of the evidence standard." Snyder v. Synder (Dec. 22, 2000), 11th Dist. No. 99-G-2230, 2000 WL 1876614, at 4. "Under this standard, the judgment of the trial court will not be reversed as being against the weight of the evidence if the court's decision is supported by competent, credible evidence." Frederick v. Frederick (Mar. 31, 2000) 11th Dist. No. 98-P-0071, 2000 WL 522170, at 5.
Generally speaking, marital property includes either real and personal property or an interest in such property owned by one or both of the spouses and was "acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i) and (ii). Further, "[p]roperty acquired during the marriage is presumed to be marital unless it can be shown to be separate." Frederick at 6.
In contrast, separate property is excluded from the definition of marital property. R.C. 3105.171(A)(3)(b). Again, in general, separate property consists of all real and personal property that was acquired by one spouse prior to the marriage. R.C. 3105.171(A)(6)(a)(i-vii).
With these concepts in mind, we turn to the instant matter. Less than a year before the marriage, appellant purchased 170 shares of stock from his sister and stepmother. According to appellant, to finance the purchase of these stocks, a loan and mortgage deed were executed by Douglass McLeod in July 1973 in the amount of $75,000. Thus, this property was not acquired during the parties' marriage as required by R.C. 3105.171(A)(3)(a)(i) and (ii).
However, appellant testified that the corporation paid this loan with the income he generated during the marriage. The debt was subsequently paid off during the marriage in June 1988. In essence, the repayment process of the loan converted appellant's separate property into a marital asset:
 "`Had the mortgage been taken to finance the purchase of the [170 shares of stock] and this property was paid for using marital monies, the property would clearly qualify as a marital asset `acquired by either or both spouses during the marriage.' See R.C. 3105.171(A)(3)(a)(i) and (ii). This would be true even if the mortgage was originally the separate debt of one party prior to a marriage, to the extent that the marital monies contributed to the repayment of the debt.'" (Emphasis added.) Boyles v. Boyles (Oct. 5, 2001), 11th Dist. No. 2000-P-0072, 2001-Ohio-4303, at ¶ 32, quoting Nuding v. Nuding (Dec. 7, 1998), 3d Dist. No. 10-97-13, 1998 WL 856923, at 3.
For the most part, the bulk of the loan used to purchase appellant's premarital stock was paid off utilizing marital funds, to-wit: income appellant generated from Douglass McLeod under his management and guidance during the marriage. And, this was not passive income, but income generated from the full-time efforts of appellant and to a lesser extent, the efforts of appellee. As acknowledged by the magistrate, appellant failed to submit evidence showing the amount of payments made on the loan prior to the marriage. Under these particular circumstances, we conclude that the trial court's determination that the 170 shares of stock were marital property was not against the manifest weight of the evidence. Appellant's first assignment of error is, therefore, without merit.
In the second assignment of error, appellant suggests that the trial court erred in finding that the Kishman property was martial in nature. According to appellant, the court failed to trace his separate funds totaling $36,000 that were used to pay off the mortgage on the Kishman property.
It is well known that "[t]he commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is nottraceable." (Emphasis added.) R.C. 3105.171(A)(6)(b). Thus, traceability becomes the focus in determining whether separate property has lost its character after being commingled with marital property. Peck v. Peck
(1994), 96 Ohio App.3d 731, 734. The party seeking to establish an asset as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property. Peck at 734; Bugos v.Bugos (Oct. 15, 1999), 11th Dist. No. 98-T-0141, 1999 WL 959835, at 3.
By way of background, the property located at 210 River Street was owned by Douglass McLeod before the marriage. Then, during the marriage in 1983, the Kishman property was purchased and titled jointly to the parties. Despite that fact, the corporation financially maintained the Kishman property. In 1988, Douglass McLeod sold the 210 River Street property, for which it received over $106,000. According to appellant, he did not segregate these funds in any way; rather, the funds were placed into a corporate account.
Two years later, in September 1990, appellant claimed that he used $36,000 of the $106,000 to pay off the remaining mortgage on the Kishman property. During the two year period after receiving $106,000 and placing it into a corporate account, appellant admitted that he paid money out of this account for business expenses, such as employee salaries and payment of bills.
Upon consideration, the magistrate determined that the proceeds from the sale of 210 River Street totaling over $106,000 was marital property. Nevertheless, even if we assume, arguendo, that $36,000 of the $106,000 was appellant's separate property, he did not meet his burden of tracing these funds. As previously noted, the proceeds from the sale of 210 River Street were not segregated in any way. Rather, appellant placed these funds into a Douglass McLeod account which he used to pay business expenses. There was insufficient evidence to prove that appellant was capable of tracing the $36,000 back to the 1988 receipt of $106,000. Thus, the trial court appropriately characterized the Kishman property as being marital.
In light of our holding that the Kishman property is marital, appellant's remaining arguments concerning the passive appreciation of this property is moot. Accordingly, the second assignment of error is not well-taken.
The third assignment of error challenges the trial court's determination that the entire increase in value of Douglass McLeod stock was marital property as being against the manifest weight of the evidence. Here, appellant argues that the appreciation of his separate property in Douglass McLeod stock is passive and remains his separate property because the appreciation was not due to the efforts or contributions of either party.
When either spouse makes a contribution, whether it is monetary, labor, or in-kind, that causes an increase in the value of separate property, the increase in the value is deemed marital property. Middendorfv. Middendorf, 82 Ohio St.3d 397, 400, 1998-Ohio-403. However, appreciation resulting from an increase in the fair market value of separate property due to its location or inflation is considered passive income. Munroe v. Munroe (1997), 119 Ohio App.3d 530, 536; Matic v.Matic (July 27, 2001), 11th Dist. No. 2000-G-2266, 2001 WL 848530, at 8. Because appellant sought to have the passive appreciation of the property characterized as separate property, he had the burden of proof on this issue by a preponderance of the evidence. Matic at 8; O'Brikis v.O'Brikis (Oct. 6, 2000), 11th Dist. No. 99-P-0045, 2000 WL 1488041, at 3; Polakoff v. Polakoff (Aug. 4, 2000), 11th Dist. No. 98-T-0163, 2000 WL 1121799, at 5.
Appellant speculates that the increased value of his interest in Douglass McLeod was attributed to passive appreciation because there was no evidence that it was due to the efforts or contributions of either party. This court, however, is unwilling to make such a speculative assumption in light of the fact that the record is devoid of evidence attributing a cause for the increase. See, e.g., Matic at 8.
As such, appellant failed in his burden of proof as there was not enough information or evidence presented at the hearing to evaluate the issue of passive appreciation of his interest in Douglass McLeod. Thus, the third assignment of error is meritless.
In the fourth assignment of error, appellant takes issue with the trial court ordering him to transfer to appellee 120.5 shares of stock in Douglass McLeod and to pay appellee the sum of $105,000, representing her interest in the Kishman and 209 River Street properties. Appellant posits that the shares of stock in the corporation would necessarily include the value of the real estate in which the corporation has an interest. Thus, by awarding appellee shares in the corporation along with a cash payment, appellant concludes that appellee is essentially receiving double appreciation.
Presumably, in the instant matter, stock value represents the corporation's value, minus the value of the Kishman and 209 River Street properties. In the October 26, 2000 judgment entry of divorce, the trial court clearly indicated which real property values were represented in the value of the shares of stock of the corporation. In doing so, the trial court did not include the values of the Kishman and 209 River Street properties in the value of the shares of stock of the corporation. Further, the September 7, 2000 judgment entry clarified that appellant was ordered to pay appellee $105,000, which represented her marital interest in the Kishman and 209 River Street properties, and transfer 120.5 shares of stock, which presumably represented her marital interest in the corporation.[4] Accordingly, appellant's fourth assignment of error lacks merit because the trial court clearly excised the two properties from the corporation. Given the tangle of personal and corporate assets, we do not find this to be an abuse of discretion.
In the fifth assignment of error, appellant maintains that the trial court abused its discretion in awarding appellee 120.5 shares of stock in Douglass McLeod. Appellant believes that such a result unnecessarily keeps the parties financially bound to each other, and leaves the parties in a position where each is a shareholder in the corporation run by appellant. Rather, appellant suggests that appellee should not continue to be a shareholder of Douglass McLeod; instead, appellant should be awarded the business, with appellee being compensated in some other manner for her interest in the business. We agree.
According to the trial court, 241.5 shares of Douglass McLeod stock were marital property. As such, the trial court order appellant to receive 121 shares, while appellee was awarded 120.5 shares. In view of the fact that appellee was not awarded spousal support, and in view of the respective age and health condition of the litigants, we agree with the magistrate, in part, that the better approach would be to provide appellee with a liquidated asset.
To accomplish this, the trial court must either: (1) order the sale of appellee's shares of stock with the right of first refusal to appellant; (2) provide each with the opportunity to buy out the other's stock based on a court approved valuation; or (3) employ any other method to provide either appellee or appellant with a fair monetary award for his or her shares of stock.[5] In light of the foregoing, appellant's fifth assignment of error is meritorious to the extent indicated.
Now, we turn to appellee's cross appeal wherein she submits the following assignments of error:
 "[1.] The trial court's determination that appellant's real estate expert's opinion should be given more weight than appellee's real estate expert's opinion was arbitrary and therefore constitutes an abuse of discretion.
 "[2.] The trial court's determination that the 47 shares of stock appellant obtained from A.S. Meyers and J.O. Shepard was contrary to the evidence and an abuse of discretion.
 "[3.] The trial court abused its discretion to the prejudice of appellee by failing to order appellant to pay any spousal support and in refusing to retain jurisdiction over an award of spousal support.
 "[4.] The trial court erred to the prejudice of appellee by failing to award her attorney fees."[6]
In the first assignment of error on cross appeal, appellee maintains that the trial court abused its discretion when it adopted the opinion of Mr. Weisenbach, appellant's appraiser, as to determining the values of the Kishman and 209 River Street properties [collectively referred to as the Grand River properties]. According to appellee, the trial court did not have sufficient evidence to adopt Mr. Weisenbach's testimony and find it credible.
Obviously, there was competing expert evidence as to the value of the Kishman and 209 River Street properties. Briefly, appellee presented the expert testimony of Mr. Baker, an independent real estate appraiser consultant employed with the firm of Wesley Baker Associates. Mr. Baker, who has been a real estate appraiser for 25 years, was asked to appraise the fair market value of the Kishman and 209 River Street properties, which were located in Grand River, Ohio.
The trial court correctly recognized that Mr. Baker did not use the cost approach method of valuing the properties. According to Mr. Baker, this method is "based on reproduction and replacement costs. In other words, what it takes to buy a piece of land for a certain use. What the cost of that * * * land is. What it cost to build a certain kind of building." Mr. Baker found this approach inapplicable and gave it no weight in valuing the instant properties because according to him, the cost approach method is primary used for new buildings.
Rather, Mr. Baker employed the income approach and market data methods in valuing the properties. Under the income approach, an appraiser determines the gross income potential of the property. Based on this methodology, Mr. Baker valued the properties at $510,000.
Finally, Mr. Baker applied the market data approach, wherein he compared the Kishman and 209 River Street properties to other similar properties. In doing so, Mr. Baker employed fifteen comparable sales, to wit: eight retail, commercial, and light industrial building sales and seven marina sales. Under the market data method, the value of the properties totaled $545,000.
After giving less weight to the market data approach than the income method, Mr. Baker opined that the fair market value of the properties totaled $525,000, to wit: $105,000 for the Kishman property and $420,000 for the 209 River Street property.
To counter appellee's expert, appellant presented the expert testimony of Mr. Weisenbach, who has been a licensed real estate broker since 1966 and has been a real estate appraiser for fourteen years.
In contrast to Mr. Barker's testimony, Mr. Weisenbach utilized the cost approach method, explaining that this method is not solely used in valuing new buildings. Under this approach, Mr. Weisenbach valued the Kishman property at $85,000, while 209 River Street was worth $280,000, for a total of $365,000.
In applying the income approach, Mr. Weisenbach opined that the value of the Kishman property was $84,000 and 209 River Street was worth $285,000, totaling $369,000. Under the market sales approach, Mr. Weisenbach compared the Grand River properties to four marinas and determined that the value of the Kishman property was $85,500 and 209 River Street was worth $280,000, for a total of $365,500.
After correlating the three valuation methods, Mr. Weisenbach assigned the fair market value of the properties as being $365,000, to wit: $85,000 for the Kishman property and $280,000 for 209 River Street.
Having found that it would not be possible to affix a value to the Grand River properties upon one or the other appraiser's determination due to the significant difference between the respective appraisers' valuations, the magistrate recommended the properties to be sold. By doing so, the magistrate essentially sidestepped the issue of valuing the properties and determining which expert provided more credible testimony.
Upon considering appellant's objection as to this point, the trial court rejected the magistrate's recommendation to sell the properties. While the trial court did not have the benefit of live testimony, it considered the testimony of both experts, including the magistrate's summary of the testimony, and determined that Mr. Weisenbach was, indeed, a more credible source for valuation of the Grand River properties:
 "Looking to the totality of the evidence that was presented via the two expert opinions, the court must find that Mr. Weisenbach's assessment of value has more credibility than Mr. Baker's. While Mr. Baker found that [the Kishman property] was not essential to the operation of the business, Mr. Weisenbach found [the Kishman property], and 209 [River Street] were, and this is in alignment with the Magistrate's conclusion. Mr. Weisenbach based his value in part on comparable that were located on Grand River [7] and looked at other marina sales that were more closely akin to the litigants' marina. Mr. Baker however, considered property in Erie, Pennsylvania known as Perry's Landing which consisted of more acreage and which had a number of amenities such as restaurant, club house, pool, cable, and computers, none of which exist at the Grand River marina. Mr. Barker did not use properties that were more comparable to the Grand River operation but noted had he, his opinion of value may have been closer to Mr. Weisenbach's. One of the main differences between the two experts was in their final approach. Mr. Weisenbach using the cost approach, Mr. Baker not using the cost approach. The court concludes that Mr. Weisenbach's opinion should be accepted and therefore assigns a value of 209 of $280,000 and [the Kishman property] a value of $85,000. The magistrate's decision is amended accordingly * * *." (Emphasis added.)
We are mindful that when reviewing evidence presented at trial, an appellate court must not reweigh the evidence. C.E. Morris v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, syllabus. In light of our above review of the record, it is evident that the trial court considered extensive evidence from both Mr. Baker and Mr. Weisenbach regarding the methodology used in determining the value of the Grand River properties. The court then accepted Mr. Weisenbach's opinion despite appellee's vigorous attempts to discredit him. In fact, during cross-examination appellee challenged the comparables employed by Mr. Weisenbach and his failure to appraise the properties as an integrated whole, which are relatively the same arguments she raises in this appeal. As such, we will not second-guess the trial court's determination that Mr. Weisenbach's testimony in valuing the Grand River properties was the more credible evidence.
Appellee also makes much of the following statement made by the trial court:
 "Mr. Barker did not use properties that were more comparable to the Grand River operation but noted had he, his opinion of value may have been closer to Mr. Weisenbach's."
As to this point, appellee maintains that during his testimony, Mr.Baker never opined that his valuations would have been closer to that of Mr. Weisenbach; thus, the trial court incorrectly found that Mr. Baker made such a statement. We disagree.
Rather, we believe that in the above statement, the trial court was merely commenting that it found Mr. Baker had failed to use properties that were more comparable to the Grand River properties and that had Mr. Baker done so, his valuations may have been closer to those offered by Mr. Weisenbach.
Furthermore, contrary to appellee's assertion, the record indicates that the trial court did "have before it sufficient evidence to justify or support the dollar figure it obtain[ed]." Polakoff at 4, citingRodriguez v. Rodriguez (Apr. 13, 1990), 11th Dist. No. 89-G-1498, 1990 WL 47458, at 2. The values selected by the trial court were based upon the testimony provided by appellant's expert. "`When expert testimony is admitted into evidence regarding property valuation, the trial court may believe all of what the witness says, none of it or part of it.'" Boyles
at 4, quoting Baker v. Baker (Apr. 7, 1997), 12th Dist. No. CA96-10-216, 1997 WL 162388, at 1. In this case, the trial court chose to believe Mr. Weisenbach and his expert opinion as to the value of the Grand River properties. Accordingly, a trial court does not abuse its discretion in determining the value of properties when it employs the values provided by the parties. Boyles at 4.
"Our task on appeal is not to require the adoption of any particular method of valuation, but to determine whether, based on all the relevant fact and circumstances, the court abused its discretion in arriving at a value." James v. James (1995), 101 Ohio App.3d 668, 681. Since there is sufficient evidence to support the trial court's finding that $85,000 is the value of the Kishman property and $280,000 is the value of 209 River Street, no abuse of discretion occurred in this case.
As a final thought on this issue, we note appellee's concern that the trial court should not have determined the credibility of the two expert witnesses since the court did not observe their testimony as the magistrate did. Thus, appellee seems to suggest that the trial court should have ordered the magistrate to determine the credibility of the expert witnesses as the magistrate had the benefit of their live testimony.
As we noted earlier, the December 15, 1999 magistrate's decision suggests that she was unable to assess the credibility of the expert witnesses due to the great difference in opinion as to the valuation of the Grand River properties:
 "[T]he real estate appraisers differed by $161,000.00 in their respective opinions as to the value of the real estate.
 "* * * Both appraisers spoke well and appeared to have extensive experience in the field.
"* * *
 "As set forth above, the difference between the respective experts' valuation of both real estate * * * is great. One of the experts noted in his testimony that appraisal is an art as well as a science. Considering the great difference in the respective experts' conclusions, there appears to have been a good deal of art applied to these appraisals. The parties would have been better served to have agreed on one real estate appraiser and one marine surveyor, requesting a truly independent third party evaluation as opposed to an individual expert valuation."
While the trial court did not have the benefit of live testimony, the court fully considered the testimony of both experts, including the magistrate's summary of the testimony. Furthermore, the trial court, not the magistrate, is the ultimate decision maker. Accordingly, the trial court did not abuse its discretion in adopting Mr. Weisenbach's valuation as being credible over that of Mr. Baker. Appellee's first assignment of error on cross appeal is, therefore, without merit.
In assignment of error two on cross appeal, appellee argues that the trial court erred when it determined that the 47 shares of stock were appellant's separate property. Appellee suggests that appellant's testimony that he was gifted these stocks is insufficient to prove that the stocks constituted separate property.
The question that appellant never answered is whether the shares were specifically and intentionally gifted only to him, and not to him and appellee. Put another way, there is no factual dispute whether appellant received gifts of stock during the marriage. During the hearing, appellant testified that he was gifted 47 shares of stock, which was uncontroverted by appellee.[8] Thus, the query becomes whether these gifts to appellant were nevertheless marital property.
A review of the law which impacts the status of gifts made to a married person is essential here. An inter vivos gift occurs when the donor executes "an immediate voluntary, gratuitous and irrevocable transfer of property" to the donee. Smith v. Shafer (1993), 89 Ohio App.3d 181, 183. "The essential elements of an inter vivos gift are as follows: (1) the intent of the donor to make an immediate gift; (2) the delivery of the property to the donee; and (3) the acceptance of the gift by the donee after the donor has relinquished control of the property." (Emphasis sic.) Frederick at 7. Accordingly, if any of these elements are not satisfied the gift as a whole fails. Id. It is undisputed that a gifting occurred here.
However, R.C. 3105.171(A)(6)(a)(vii) provides that a gift acquired by either spouse during the course of the marriage is presumed to be maritalproperty unless it is shown by clear and convincing evidence to have beenintended by the donor to be the exclusive property of the recipientspouse. Barkley v. Barkley (1997), 119 Ohio App.3d 155, 168. "Clear and convincing evidence" has been defined as "that degree of proof which will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." (Citations omitted.) Barkley at 168-169. Thus, appellant, as the donee spouse seeking to have the 47 shares of stock deemed separate property in this case, bore the burden of proof on this issue. Id. at 168. Specifically, appellant needed to provide clear and convincing evidence to overcome the presumption that any gift to him was a gift to both himself and appellee.
As to this point, appellant testified that during the marriage, he was gifted 47 shares of stock:
 "Q. Okay. And then during the marriage, you got A.S. Myers' [32 shares] stock; right?
"A. That was gifted to me, yes.
"Q. Sir, do you have any record that it was a gift?
"A. No.
"Q. Did you pay a gift tax return?
"A. No, I did not.
"* * *
 "Q. And you paid for the you got the J.O. Shepherd [18 shares] stock too; right?
"A. It was gifted to me.
"Q. Do you have any records that it was a gift, sir?
"A. No.
"* * *
 "Q. Okay. And you have no record that it was a gift that you did acquire shares?
 "A. It was — it was — it was a gift from a phone conversation I guess.
"Q. Sir, you have no record that establishes
 "A. Well, I'm telling you the record's in my mind. I know about that. I'm telling you the truth, see."
It is evident from the above exchange that appellant made no attempt to testify as to the facts and events surrounding the gifting of these stocks. Further, there was no testimony as to the donor's intent. Under such circumstances, we believe that appellant failed to prove, by clear and convincing evidence, that the stocks, which were gifted to him, were solely intended for him. Accordingly, the trial court erred in determining that the 47 shares of stock were appellant's separate property. Appellee's second assignment of error on cross appeal is, therefore, well-taken. In accordance with the disposition of appellant's fifth assignment of error, appellee's marital interest in the 47 shares of stock is to be included.
In assignment of error three on cross appeal, appellee challenges that the trial court's refusal to award her spousal support and failure to retain jurisdiction to modify such order.
It is well-established that pursuant to R.C. 3105.18(C)(1), the trial court enjoys broad discretion in awarding spousal support to either party when it is "appropriate and reasonable" to do so. Glass at 2. Such an award will not be disturbed on appeal absent an abuse of discretion.Kunkle v. Kunkle (1990), 51 Ohio St.3d 64, 67.
To determine whether spousal support is appropriate and reasonable, the trial court is required, under R.C. 3105.18(C)(1), to consider all of the following factors:
 "(1) the income of the parties; (2) the earning abilities of the parties; (3) the ages and health of the parties; (4) the parties' retirement benefits; (5) the duration of the marriage; (6) the appropriateness of the parties to seek employment outside the home; (7) the marital standard of living; (8) the education of the parties; (9) the assets and liabilities of the parties; (10) the contribution of either party to the other's education; (11) the cost of education of the party seeking support; (12) the tax consequences of a spousal support award; (13) the lost income that results from the parties' marital responsibilities; and (14) any other factor the court deems relevant." Davis v. Davis
(Mar. 31, 2000), 11th Dist. No. 98-P-0122, 2000 WL 522481, at 3.
In Stafinsky v. Stafinsky (1996), 116 Ohio App.3d 781, 784, this court held that a trial court must provide facts and reasons when awarding spousal support:
 "In making spousal support awards, R.C. 3105.18
requires the trial court to review the statutory factors in [R.C. 3105.18(C)(1)] that support such an order, and then indicate the basis for awarding spousal support in sufficient detail to facilitate adequate appellate review. Kaechele v. Kaechele (1988), 35 Ohio St.3d 93, 96-97 * * *." (Parallel citation omitted and emphasis added.)
With the above principles in mind, we determine that the magistrate's December 15, 1999 decision, which was subsequently adopted by the trial court on August 16, 2000, satisfies the requirement to provide facts and reasons when awarding spousal support.
In reviewing a spousal support award, an appellate court must "look at the totality of the circumstances and determine whether the trial court acted unreasonably, arbitrarily or unconscionably * * *." Kunkle at 67.
In the case sub judice, appellant, 67 years old, receives $909 a month in social security income, $489 per month from Douglass McLeod, $100 per month from marine surveys and $200 per month from investment income rolled over, for a total income of $1,698 per month. Appellant sustained a heart attack followed by catherization a few years prior to this proceeding. He also has an inflamed disc, stomach problems, and takes medication for his heart condition.
In contrast, appellee is 66 years old and receives $490 in social security income and $250 interest, for a total monthly income of $740. Appellee has dental problems, high blood pressure, high cholesterol, and has been treated for skin cancer.
This is the second marriage for both parties. Although they were married for 23 years, there is no marital debt, and no children have been born as issue of the marriage. The trial court provided for an equitable division of the marital property wherein the court specifically awarded appellee a cash distribution in the amount of $105,000 for her interest in the Kishman and 209 River Street properties. Appellee also retained her checking account, an IRA account in the amount of $34,134.56, her house and condominium, $6,942.22 from appellant's savings account, $3,300 from the money market account held with her mother, and the balance of her McDonald Investment account.
When we consider the totality of the circumstances here, we cannot say that the trial court abused its discretion in finding that appellee was not entitled to spousal support. While we may have reached a different conclusion had we been asked to decide the matter in place of the trial court, our function upon review is merely to measure the lower court's adherence to the standards of fairness, not substitute our judgment for that of the trier of fact. Kaechele at 94.
Next, appellee argues that the trial court erred when it failed to retain jurisdiction over the issue of spousal support. At the outset, this seems to be an issue of first impression for this court. As such, we take notice of the fact that there is a spilt among the appellate courts on the issue of whether a trial court can retain jurisdiction to modify spousal support when the court initially chooses to award no support.
For instance, in Aylstock v. Bregenzer (June 29, 1994), 2d Dist. No. 14325, 1994 WL 371330, at 2, the Second Appellate District held that the trial court did not abuse its discretion when it reserved jurisdiction in the original divorce proceeding to modify spousal support when no spousal support had been awarded:
 "This was reasonable even thought the trial court found no spousal support necessary at the time [of the divorce] because of its imputation of income to [wife], since the imputation of income involved some uncertainty, so that actual events might prove the imputation to have been erroneously high.
 "Although R.C. 3105.18(E) does not expressly provide for the modification of spousal support when no spousal support has been ordered initially in the divorce decree, it does not expressly prohibit a modification under those circumstances. Where the trial court has reserved jurisdiction for a reasonable period of time to modify spousal support if its projection of earning ability should prove to be erroneous in the light of the changed circumstances inherent in actual subsequent experience, we conclude that it is consistent with the purposes underlying the statute to permit a modification allowing spousal support when a satisfactory showing of changed circumstances has been made." (Emphasis added.) See, also, Okos v. Okos (2000), 137 Ohio App.3d 563, 573; Tomovcik v. Tomovcik (Jan. 22, 1997) 7th Dist. No. 95-JE-22, 1997 WL 28548, at 4; Harbert v. Harbert (Nov. 1, 1995), 2d Dist. No. 95 CA 41, 1995 WL 643118, at 3.
In contrast, other appellate courts, such as the Third Appellate District in Wolding v. Wolding (1992), 82 Ohio App.3d 235, 239, have determined that a trial court does not have authority to retain jurisdiction over the issue of spousal support when the court has made a specific finding that spousal support is not warranted:
 "R.C. 3105.18[E] * * * provides that the trial court has continuing jurisdiction to modify the terms or amount of an order for periodic alimony only if it finds that the circumstances of either party have changed and the decree or separation agreement contains a provision specifically authorizing the court to make such modification. We have found nothing which authorizes a trial court to continue jurisdiction over the issue of alimony when it made a specific finding that no alimony was warranted at the time of divorce.
 "In Ressler v. Ressler (1985), 17 Ohio St.3d 17, 18, 17 OBR 14, 15, 476 N.E.2d 1032, 1033, the Supreme Court held that `alimony decrees should possess a degree of finality and certainty.' We believe that divorce decrees which make a specific finding that alimony is not warranted should also possess a degree of finality and certainty:
 "`In order to provide stability, the law look[s] with favor on the principle of "finality of judgments." The reason for this principle is that persons must be able to rely on court rulings. If courts had continuing jurisdiction to modify all decrees, there would be confusion and uncertainty.'" Bean v. Bean (1983), 14 Ohio App.3d 358, 361, 14 OBR 462, 466, 471 N.E.2d 785, 790, citing Popovic v. Popovic (1975), 45 Ohio App.2d 57, 64, 74 O.O.2d 94, 98, 341 N.E.2d 341, 346.
"* * *
 "We find that the trial court does not have the authority to continue jurisdiction concerning the issue of alimony in this matter where it made a specific finding that alimony was not warranted. Its attempt to reserve such jurisdiction for future consideration is error." (Emphasis added and footnote omitted.) See, also, Vona v. Vona (Feb. 5, 2001), 5th Dist. No. 00-CA-00040, 2001 Ohio App. LEXIS 433, at 16-17; Ward v. Ward (May 4, 2000), 10th Dist. No. 99AP-66, 2000 Ohio App. LEXIS 1934, at 6-11; Larkey v. Larkey (Nov. 4, 1999), 8th Dist. No. 74765, 1999 WL 1000688, at 7.
We find that the better practice would be to refrain from setting forth a blanket rule that a trial court is never permitted to reserve jurisdiction to modify spousal support when the court initially grants no support. Rather, we hold that a trial court can retain jurisdiction to modify spousal support even if no spousal support is ordered at the time of the final decree so long as the retention of jurisdiction is supported by the facts of the case. See Vona at 17-19, (Edwards, J., concurring in part and dissenting in part). That is not to say that the trial court can reserve jurisdiction indefinitely. Instead, "a trial court can reserve jurisdiction for a limited, reasonable period of time that does not last longer than an actual award of spousal support would last, to modify spousal support * * *." Okos at 580. Such a holding not only provides finality in judgments, but permits a court to retain jurisdiction if the circumstances deem it to be warranted.
In light of this holding, we conclude that the trial court did not abuse its discretion in refusing to retain jurisdiction over the issue of spousal support. The facts of this particular case do not support such a retention of jurisdiction as the financial status of each party is stable, and there is no uncertainty as to any of the factors enumerated in R.C. 3105.18(C)(1). Accordingly, appellee's third assignment of error on cross appeal is meritless.
In the fourth and final assignment of error on cross appeal, appellee asserts that the trial court's refusal to award her attorney fees is erroneous because the court relied on the magistrate's finding which is inconsistent with the court's ruling on property division.
In the December 15, 1999 decision, the magistrate recommended that given the equal division of marital property, each party should be responsible for his/her attorney fees. A review of the trial court's August 16, 2000 judgment entry indicates that the court agreed with this statement, even though it modified the magistrate's disposition of marital property by rejecting the recommendation to sell the corporation and real estate.
Despite that modification, the trial court still provided an equitable division of the marital property. In fact, according to the trial court's order, appellee was awarded a cash distribution of $105,000 for her marital interest in the Kishman and 209 River Street properties. In light of the foregoing, it was not inconsistent for the trial court to rely on the magistrate's general recommendation that the equal division of marital property justified the refusal to award appellee attorney fees.
Appellee also claims that pursuant to R.C. 3105.18(H), the trial court abused its discretion in refusing to grant her attorney's fees.
The decision whether to award attorney fees is a matter within the sound discretion of the trial court. Frederick at 25. As such, absent a clear abuse of discretion, a reviewing court will not reverse the judgment of the trial court. Glass at 11.
When a party requests attorney fees in a divorce proceeding, R.C.3105.18(H) is applicable and provides the following:
 "In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees."
Before the trial court may award attorney fees to a party, it must consider two distinct factors:
 "(1) the court must ascertain whether the other party has the ability to pay the requesting party's attorney fees; and (2) the court must consider whether either party will be prevented from fully litigating his or her rights and adequately protecting his or her interests if it does not award reasonable attorney fees." Frederick
at 25.
In applying R.C. 3105.18(H) and the two-prong test, the trial court made the following determination:
 "In the case at bar, the evidence established both parties have the ability to pay their own [attorney] fees. The evidence did not establish that wife, without an award of [attorney] fees, was prevented from fully litigating her rights and protecting her interests."
Upon consideration, we believe that the trial court did not abuse its discretion in ordering appellee to pay her own attorney fees. Appellee proposes that appellant's social security income exceeds her own, and he was awarded the business from which he can earn income. However, appellee ignores income sources that she is entitled to under the divorce decree. Specifically, appellee was awarded a cash distribution in the amount of $105,000; there was no marital debt assigned to her; she retained her checking account; an IRA account in the amount of $34,134.56; her house and condominium; $6,942.22 from appellant's savings account; $3,300 from the money market account held with her mother; and the balance of her McDonald Investment account. Further, there is no indication that appellee has been or will be prevented from fully litigating her rights and adequately protecting her interest in light of the trial court's decision not to award her attorney fees.
Appellee also suggests that the trial court should have retained continuing jurisdiction over the issue of attorney fees. We find no fault with this conclusion, with the caveat that we do not read it to be prospective as to further litigation in this case. The fourth assignment of error on cross appeal is, therefore, without merit.
Based on the foregoing analysis, the judgment of the trial court is affirmed in part, reversed in part, and the matter is remanded for proceedings consistent with this opinion.
WILLIAM M. O'NEILL, P.J., ROBERT A. NADER, J. concur.
[1] For ease of discussion, appellant/cross-appellee, Raymond D. McLeod, will be refereed to as appellant while appellee/cross-appellant, Ruth H. McLeod, will be referred to as appellee.
[2] A review of the record on appeal reveals that a three volume transcript of the hearing before the magistrate had been filed with this court on January 29, 2001. However, absent from the record on appeal are the exhibits that were admitted into evidence during the hearings. Under such circumstances, we will review the record as if the exhibits were never admitted.
[3] Appellee filed a cross appeal in this matter, and it will be addressed later in this opinion.
[4] As an aside, we note that the Kishman property was acquired during the marriage and titled jointly to the parties. Despite that fact, Douglass McLeod maintains this property in that the corporation receives rent and is accounted for on the corporation's books. In addition, 209 River Street is held in the name of the corporation.
[5] The record on appeal does not indicate the present monetary value of the Douglass McLeod stock. While the magistrate indicated in her report that the value of appellant's separate property of 127.5 shares of stock was worth $441.18 per share, we note that this was the value of the stock in 1973.
[6] As an aside, we note that appellant has not filed an answer brief in this cross appeal.
[7] As to this point, the trial court may have been referring to Mentor Lagoons, which is located in Mentor-on-the-Lake, near Grand River, Ohio.
[8] At the hearing, appellee stated that prior to the marriage, appellant owned 42.5 shares of stock and later inherited 85 shares of stock from his father's estate. According to appellee, all remaining shares of stock "we purchased after we were married." Despite that broad claim, appellee never addressed or specifically refuted appellant's contention that he was gifted 47 shares of stock during the marriage.